**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **CICLEY MASON, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF MARIO LATRELL MASON, DECEASED;**<br><br>**PLAINTIFF,**<br><br>**v.**<br><br>**(1) OKLAHOMA COUNTY CRIMINAL JUSTICE AUTHORITY; (2) BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF OKLAHOMA; (3) JOHN DOES 1-10, detention officers and supervisors, in their individual capacities; (4) JOHN DOES 11-15, medical and mental health personnel, in their individual capacities; and (5) JOHN DOES 16-20, detention officers, in their individual capacities,**<br><br>**DEFENDANTS.** | **Case No: CIV-26-**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** the Plaintiff Cicley Mason, as Personal Representative of the Estate of Mario Latrell Mason, deceased, and for her Complaint against Defendants alleges and states as follows:

## INTRODUCTION

1. Mario Latrell Mason was 26 years old and the father of a young son. On May 12, 2025, he was found hanging in his cell at the Oklahoma County Detention Center ("OCDC" or "the Jail"), eighteen days after he was sentenced to life imprisonment.

2. Mario's death was neither sudden nor unforeseeable. On the day he died, Mario returned to his cell from a distressing meeting and was left unobserved for hours, in violation of the Jail's own sight-check requirements.

3. Mario was the seventh person to die in OCDC custody in 2025, as many as died in all of 2024, and one of roughly sixty people who have died there since Defendant Oklahoma County Criminal Justice Authority took over the Jail in 2020. Missed sight checks, chronic understaffing, and inadequate suicide prevention at OCDC were documented in state inspection after state inspection before Mario died. Defendants knew and did not fix them.

4. Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 and Oklahoma law to hold Defendants accountable for the force used against Mario after his sentencing and for his death.

**PARTIES**

5. Plaintiff Cicley Mason is Mario's mother and a resident of Oklahoma County, Oklahoma. She was appointed Personal Representative of the Estate of Mario Latrell Mason by the District Court of Oklahoma County on November 9, 2026, in Case No. PB-2026-1266. She brings this action on behalf of the Estate and for the benefit of Mario's statutory beneficiaries, including his minor son, M.M., and herself.

6. Mario Latrell Mason ("Mario" or "Mr. Mason") was a resident of Oklahoma County. He was in the custody of OCDC from May 23, 2024, until his death on May 12, 2025.

7. Defendant Oklahoma County Criminal Justice Authority ("OCCJA" or "the Trust") is a public trust organized under 60 O.S. § 176 et seq., with Oklahoma County as its beneficiary. Since July 1, 2020, OCCJA has operated OCDC and has been responsible for

its policies, customs, staffing, training, supervision, housing, inmate monitoring, and suicide prevention. Since October 2024, OCCJA has also directly employed and supervised the Jail's medical and mental health staff. OCCJA is a "person" subject to suit under 42 U.S.C. § 1983 and a political subdivision under the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151 et seq. ("GTCA").

8. Defendant Board of County Commissioners of the County of Oklahoma ("the Board" or "the County") is the governing body of Oklahoma County and the proper party to sue the County under 19 O.S. § 4. The County owns the OCDC building, is the beneficiary of OCCJA, funds Jail operations, and remains responsible under Oklahoma law for providing a jail. The County is a "person" under 42 U.S.C. § 1983 and a political subdivision under the GTCA.

9. Defendants John Does 1-10 are detention officers, shift supervisors, and other OCCJA personnel responsible for supervising and monitoring Mario's housing unit, conducting required sight checks, and responding to warnings about his welfare, including the staff who received warnings about Mason’s mental state and risk. Their names are presently unknown to Plaintiff. Plaintiff will amend to name them once identified. They are sued in their individual capacities and at all relevant times acted under color of state law and within the scope of their employment.

10. Defendants John Does 11-15 are medical and mental health personnel employed or retained by OCCJA who were responsible for screening, assessing, monitoring, and treating Mario, including after his conviction and sentencing. Their names are presently

unknown to Plaintiff. They are sued in their individual capacities and at all relevant times acted under color of state law and within the scope of their employment.

11. Defendants John Does 16-20 are detention officers and other OCCJA personnel who removed Mario from his cell, beat him, and sprayed him with bear spray shortly after his sentencing, or who were present and failed to intervene. Their names are presently unknown to Plaintiff. Plaintiff will amend to name them once identified. They are sued in their individual capacities and at all relevant times acted under color of state law.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), because they arise under 42 U.S.C. §§ 1983 and 1988 and the Constitution of the United States.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a), because they form part of the same case or controversy as the federal claims.

14. Venue is proper in this District under 28 U.S.C. § 1391(b), because all Defendants reside in this District and all events giving rise to these claims occurred in Oklahoma County, which lies within the Western District of Oklahoma. 28 U.S.C. § 116(c).

## FACTUAL ALLEGATIONS

### *A. Mario's custody and his heightened risk of suicide*

15. Mario was booked into OCDC on May 23, 2024.

16. In April 2025, Mario was convicted of first-degree murder. On April 24, 2025, he was sentenced to life imprisonment. He remained at OCDC awaiting transfer to the Oklahoma Department of Corrections.

17. The period immediately following conviction and a lengthy sentence is a well-recognized period of heightened suicide risk for people in custody.

18. Shortly after Mario was sentenced on April 24, 2025, Defendants John Does 16-20 removed Mario from his cell, beat him, and sprayed him with bear spray.

19. Upon information and belief, at the time Defendants used this force, Mario was not resisting and posed no threat to officers, other detainees, or himself that could justify beating him or spraying him with a chemical agent. Recordings of jail calls with Mario's mother and sister made shortly after the incident corroborate that it occurred. Mario's mother also lodged complaints and initiated an incident report in response to the beating.

20. As a result of the beating and chemical spray, Mario suffered physical injuries and pain. Upon information and belief, Defendants did not promptly decontaminate Mario or provide medical evaluation or treatment for his injuries. In fact, they denied him the ability to shower and informed him that he would be forced to sit with the chemical spray on his skin, while it continued to burn and irritate him, prolonging his excruciating pain.

21. Following the use of force, Defendants moved Mario to the Jail's mental health unit briefly.

22. Upon information and belief, Defendants returned Mario to general population shortly thereafter, without an adequate suicide risk assessment and without placing him on suicide precautions or increased observation.

23. Upon information and belief, at the time of Mario's death, he was not placed on suicide precautions or increased observation, and Mario was housed by Defendants in a cell containing fixtures that could be used as ligature points.

***B. May 12, 2025***

24. Before Mario's death, a witness who was assigned to work the day shift on May 12, 2025, informed fellow jail staff to monitor and check on Mario due to his obvious mental state. Mason's mother, Plaintiff, also asked jail staff to check on him numerous times following a series of distressing calls she had received from Mario leading up to this date.

25. Said employee witness was left with the impression that Mario was not a priority. Upon information and belief, no one checked on Mario in response.

26. On the date of his death Mario had a meeting with his criminal counsel regarding the possibility of post-conviction relief, which did not end well, causing Mario to return to his cell in visible distress. Upon information and belief, Jail staff knew of the meeting and its distressing nature and knew of  the witness' warnings about his mental state, yet did not observe or check on Mario after he returned.

27. OCDC policy and Oklahoma jail standards require detention staff to conduct at least one visual sight check of every cell each hour and checks every 15 minutes for detainees on suicide watch.

28. After returning to his cell, Mario hanged himself.

29. A former inmate witness who was housed in the cell directly above Mario spoke with Mario through the vents connecting their cells, and Mario informed him of his plan to commit suicide.

30. The former inmate witness immediately informed the jail staff of Mario's plan, to no avail.

31. Once it was confirmed by the inmate witness that Mario was hanging, said witness, along with other inmates housed near Mario's cell, placed numerous calls to jail nursing staff to inform them that Mario was hanging himself and in the process of dying. The calls were met with indifference.

32. According to the inmate witness, it took hours before the jail staff came to check on Mario. When confronted about the delay by the former inmate witness, nursing staff on duty stated that they did not come check on Mario despite receiving back-to-back calls, because they did not believe the statements of the inmates.

33. Mario was not discovered until approximately 5:37 p.m., when staff conducting a welfare check that inmates had been begging for found him unresponsive. Jail medical staff, EMSA, and Oklahoma City Fire Department personnel attempted life-saving measures. Mario was taken to a hospital, where he was pronounced dead at 6:46 p.m.

34. Upon information and belief, Mario had been hanging for hours before he was found, because Defendants John Does 1-10 did not conduct the sight checks required during that period, ignored the calls of inmates, and/or recorded checks that did not occur.

35. Had the required checks been performed, or had staff responded to Plaintiff's and the witnesses' warnings, Mario would have been found in time to intervene and save his life.

36. Upon information and belief, Mario experienced conscious physical pain, fear, and mental anguish before his death.

***C. After Mario's death***

37. Plaintiff arrived at OCDC at approximately 5:45 p.m. on May 12, 2025, after learning via social media that Mario may have hanged himself. No one from the detention center came outside to speak with her until approximately 9:50 p.m., when she was told her son had died.

38. Following Mario’s death, jail officials told Plaintiff that Mario's cell was "under investigation." Since then, Defendants have refused to release Mario's personal property, including his journal and his wallet. Mario's journal may contain evidence of his mental state in the days before his death. Plaintiff has demanded that all such evidence be preserved.

39. Mario's death was the seventh in OCDC custody in 2025, equal to the number of deaths in all of 2024.

***D. Defendants' longstanding knowledge of deadly conditions at OCDC***

40. OCCJA took over operation of OCDC from the Oklahoma County Sheriff on July 1, 2020. Since then, OCCJA has been the final policymaker for jail operations, including staffing, sight checks, housing, suicide prevention, and, since October 2024, medical and mental health care. The County funds those operations through its Budget Board, and county officials, including the Sheriff and county commissioners, have served on the Trust.

41. At least sixty people have died in OCDC custody since OCCJA took over in 2020.

42. In March 2023, a state multicounty grand jury issued a final report after fourteen months of testimony about OCCJA and OCDC. It noted 37 deaths at the Jail since July 1,

2020, and recommended that OCCJA dissolve itself and return Jail operations to the Sheriff.

43. The Oklahoma State Department of Health ("OSDH") has found OCDC out of substantial compliance with state jail standards in inspection after inspection since 2020. Missed sight checks have been a recurring deficiency in those reports. Before Mario's death, these included:

a. February 2021: an unannounced inspection found detention officers were not consistently performing required hourly sight checks, and checks of detainees on suicide watch or under observation were inconsistent.

b. October 2021: an inspection found detainees on suicide watch, who required checks every 15 minutes, often were not checked, with gaps of up to two hours or more.

c. Late 2021: a detainee in a mental health unit was found hanging after going almost twelve hours without a check, and the responsible detention officer was fired for failing to perform required checks. A contemporaneous OSDH inspection found only ten detention staff assigned on one overnight shift to cover seven floors holding about 1,690 detainees.

d. December 2024: five months before Mario's death, an inspection found substantial problems with missed sight checks and obscured cell windows.

44. Rather than correct these deficiencies, OCCJA in 2024 attempted to block OSDH inspectors from conducting unannounced inspections. The Oklahoma Supreme Court unanimously rejected that effort on May 29, 2025, holding that OSDH may inspect the Jail without notice.

45. OCDC has been chronically understaffed. In 2025, the Jail had approximately 360 staff, fewer than half of them detention officers, well short of the roughly 500 needed to operate the facility safely. Understaffing directly causes missed sight checks and delayed emergency responses.

46. Turn Key Health Clinics, OCDC's medical contractor since 2018, left the Jail on October 9, 2024, citing insufficient security staff to give its providers access to patients in need. OCCJA then took over medical and mental health care directly, hiring about 62 former Turn Key staff who reported to the Jail's chief executive. OCDC's health services had not been accredited by the National Commission on Correctional Health Care since 2018.

47. OCCJA's leadership has been unstable. About twenty people served on the Trust between 2020 and mid-2025, and the Jail's chief executive resigned in early 2025. At the time of Mario's death, an interim chief executive had held the job for about three months.

48. The County has long known that the Jail cannot safely house detainees with mental health needs. In 2024, a sitting county commissioner publicly acknowledged that many Jail deaths involved mental health and that the building was not designed to care for detainees with mental illness. The building opened in 1991 and, upon information and belief, contains cell fixtures and features that have long been known to present ligature risks.

49. These conditions did not change after Mario's death. An OSDH inspection completed in May 2026, the Jail's twelfth consecutive failed inspection, found that at least 2,400 required sight checks between April 7 and May 4, 2026, did not occur or were improperly documented. More than 1,900 of those missed checks were for high-risk detainees on

suicide watch or in suicide-prevention, mental health, or restrictive housing. Inspectors also found suicide observation records missing for dates in 2025 and 2026.

50. Defendants OCCJA and Oklahoma County had actual knowledge, through deaths, inspections, the grand jury report, litigation, and public reporting, that missed sight checks, understaffing, and inadequate suicide prevention at OCDC created a substantial risk of serious harm and death to people in custody. They consciously chose not to take reasonable steps to correct those conditions. Defendants also knew that Jail staff disregarded inmates' calls for emergency help. In February 2021, an inmate twice called the Jail's operations center seeking help for his dying cellmate, Parker Stephens, and no one came. *See,* OKWD Case No. CIV-23-114-PRW.

51. The policies, customs, and practices of OCCJA and the County that caused Mario's death include:

a. a widespread custom of failing to conduct, or falsely documenting, required sight checks;
b. chronic understaffing of housing units at levels that made required checks and timely emergency response impossible;
c. failing to reassess suicide risk after significant adverse legal events, including conviction and sentencing;
d. failing to respond to warnings from family members about a detainee's safety;
e. failing to remove or mitigate known ligature hazards and obscured cell windows;
f. inadequate mental health staffing, screening, and treatment;

g. a custom of disregarding or refusing to respond to inmates' reports of medical emergencies, including reports that a detainee is attempting suicide or is in physical distress; and

h. failing to train, supervise, and discipline staff regarding suicide prevention, sight checks, and emergency response.

***E. Compliance with the Governmental Tort Claims Act***

52. On May 6, 2026, Plaintiff, through counsel, sent a written Notice of Claim under 51 O.S. § 156 by certified mail, return receipt requested, to the Board of County Commissioners of Oklahoma County, the Sheriff of Oklahoma County, and OCCJA.

53. The County acknowledged in writing that the claim was filed with Oklahoma County on May 12, 2026, within one year of Mario's death.

54. OCCJA received the Notice of Claim on May 7, 2026.

55. On July 27, 2026, the County, through the Oklahoma County District Attorney, denied the claim in writing.

56. OCCJA did not approve the claim within ninety days of receipt, and the claim is deemed denied as to OCCJA under 51 O.S. § 157(A).

57. Plaintiff has complied with all notice requirements of the GTCA and brings this action within 180 days of the denial of her claim, as required by 51 O.S. § 157(B).

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983: Deliberate Indifference to Risk of Suicide (Eighth and Fourteenth Amendments) as Against John Does 1-10

58. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

59. The Eighth Amendment, applied to the States through the Fourteenth Amendment, requires jail officials to take reasonable measures to protect people in their custody from a substantial risk of serious harm, including suicide. To the extent Mario's status is deemed that of a pretrial detainee, the Due Process Clause of the Fourteenth Amendment affords him at least the same protection.

60. Mario faced a substantial and obvious risk of suicide. He had just been sentenced to life imprisonment, an employee witness, at least one inmate witness, as well as his mother, had warned Jail staff and begged them to check on him, on the date of his death, after he had returned to his cell from a distressing meeting. After his sentencing, Defendants had also beaten him, sprayed him with bear spray, and moved him to the Jail's mental health unit, and upon information and belief returned him to general population shortly thereafter.

61. John Does 1-10 knew of that risk. They received Plaintiff's warnings and knew of Mario's recent sentence and of his meeting that day. They disregarded the risk by refusing to check on him, deeming him "not a priority," ignoring the pleas of fellow inmates, and failing to conduct required sight checks for hours.

62. John Does 1-10 also knew that people in OCDC custody faced a substantial risk of death when required sight checks were not performed and disregarded that risk by skipping or falsifying the checks of Mario's cell on May 12, 2025.

63. These Defendants acted with deliberate indifference to Mario's safety, and their conduct was objectively unreasonable.

64. Their conduct was a direct and proximate cause of Mario’s conscious pain and suffering and his death.

65. Their conduct was reckless and callously indifferent to Mario’s federally protected rights, entitling Plaintiff to punitive damages against them.

## COUNT II
## 42 U.S.C. § 1983: Deliberate Indifference to Serious Medical and Mental Health Needs (Eighth and Fourteenth Amendments) as Against John Does 11-15

66. Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

67. Mario's risk of suicide after his conviction and life sentence was a serious medical and mental health need, one so obvious that even a layperson would recognize the need for attention.

68. Upon information and belief, John Does 11-15 knew of Mario's conviction and sentence and of facts showing his heightened risk of suicide, yet failed to reassess him, failed to refer him for mental health evaluation or treatment, and failed to order suicide precautions or increased observation. Upon information and belief, John Does 11-15 also knew that Mario had been placed on the Jail's mental health unit after his sentencing, and cleared him for return to general population without an adequate suicide-risk assessment.

69. On May 12, 2025, inmates housed near Mario's cell placed repeated, back-to-back calls to the Jail's nursing staff reporting that Mario was hanging and in the process of dying. John Does 11-15, including the nursing staff on duty, received those calls and did not respond, check on Mario, or summon detention staff to his cell for hours.

70. When later confronted about the delay, nursing staff on duty stated that they did not respond because they did not believe the inmates' reports. John Does 11-15 thus knew of a reported, life-threatening medical emergency and consciously chose not to respond to it, delaying any medical intervention until Mario could no longer be saved.

71. These Defendants acted with deliberate indifference to Mario's serious medical and mental health needs, including the medical emergency reported to them on May 12, 2025, directly and proximately causing his conscious pain and suffering and his death.

72. Their conduct was reckless and callously indifferent to Mario's federally protected rights, entitling Plaintiff to punitive damages against them.

## COUNT III
## 42 U.S.C. § 1983: Excessive Force and Failure to Intervene (Eighth and Fourteenth Amendments) as Against John Does 16-20

73. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

74. The Eighth Amendment prohibits prison officials from using force maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline. To the extent Mario's status at the time of the force is deemed that of a pretrial detainee, the Due Process Clause of the Fourteenth Amendment prohibits any force that is objectively unreasonable.

75. As alleged in Paragraphs 18 through 20, John Does 16-20 beat Mario and sprayed him with bear spray when he posed no threat that justified any such force. The force used was grossly disproportionate to any legitimate need.

76. John Does 16-20 used this force maliciously and sadistically for the purpose of causing harm, and not in a good faith effort to maintain or restore discipline. Their use of force was also objectively unreasonable.

77. Each of John Does 16-20 who was present during the use of force but did not participate in it had a realistic opportunity to intervene and prevent the harm to Mario and failed to do so.

78. The conduct of John Does 16-20 was a direct and proximate cause of Mario's physical injuries, pain, fear, and emotional distress. The Estate is entitled to recover the damages Mario could have recovered for these injuries.

79. Their conduct was reckless and callously indifferent to Mario's federally protected rights, entitling Plaintiff to punitive damages against them.

**COUNT IV**
**42 U.S.C. § 1983: Municipal Liability as Against Defendant OCCJA**

80. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

81. OCCJA is the final policymaker for the operation of OCDC, including staffing, sight checks, housing, suicide prevention, and medical and mental health care.

82. The policies, customs, and practices described in Paragraph 51 were so widespread, persistent, and well documented that they had the force of official policy. OCCJA knew of them through repeated deaths, OSDH inspection reports, the grand jury's findings, litigation, and public reporting.

83. OCCJA also failed to adequately train, supervise, and discipline its staff regarding sight checks, suicide prevention, mental health referral, response to family warnings, response

to inmates' reports of medical emergencies, and emergency response. The need for more and different training and supervision was obvious, and the failure to provide it was likely to result in constitutional violations.

84. OCCJA acted with deliberate indifference to the known and obvious consequence that its policies, customs, and failures would result in the deaths of people in its custody, including by suicide.

85. OCCJA's policies, customs, and failures were the moving force behind the violation of Mario's constitutional rights and his death.

## COUNT V
## 42 U.S.C. § 1983: Municipal Liability as Against Defendant Board of County Commissioners

86. Plaintiff incorporates the preceding paragraphs.

87. The County retains responsibility under Oklahoma law for providing and funding a jail, owns the OCDC building, and is the beneficiary of OCCJA.

88. With actual knowledge of the deaths, the inspection findings, the grand jury's report, and the chronic understaffing and dangerous physical conditions at OCDC, the County made deliberate decisions not to provide the funding, staffing, and facility repairs necessary to make the Jail reasonably safe, and not to remediate known ligature hazards and obscured cell windows.

89. In the alternative, because OCCJA operates OCDC as an instrumentality of the County and for the County's benefit, OCCJA's policies and customs are attributable to the County.

90. The County acted with deliberate indifference to the known and obvious consequence that its decisions would result in the deaths of people in custody, and its policies, customs, and decisions were a moving force behind the violation of Mario's constitutional rights and his death.

## COUNT VI
## Survival: Negligence (12 O.S. § 1051; GTCA) as Against Defendants OCCJA and Board of County Commissioners

91. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

92. Under 12 O.S. § 1051, Mario's cause of action for the injuries he suffered before his death survives him and may be brought by the personal representative of his estate.

93. OCCJA and the County, acting through their employees within the scope of their employment, owed Mario a duty to exercise reasonable care for his safety and health while he was in their custody, including a duty to protect him from foreseeable self-harm.

94. OCCJA and the County breached that duty by, among other things:

a. failing to reassess Mario's risk of suicide after his conviction and life sentence;
b. failing to respond to Plaintiff's warnings and requests that staff check on Mario;
c. failing to conduct the sight checks of Mario's cell required on May 12, 2025;
d. failing to staff Mario's housing unit at a level that allowed required checks and timely emergency response;
e. failing to remove or mitigate known ligature hazards and obscured cell windows;
f. failing to provide adequate mental health screening, evaluation, and treatment; and

g. failing to adequately train and supervise detention and medical staff in suicide prevention, sight checks, and emergency response.

95. As a direct and proximate result of these breaches, Mario experienced conscious physical pain, fear, and mental anguish before his death. Upon information and belief, he hanged in his cell for hours before staff found him.

96. Had Mario survived, he could have maintained an action against OCCJA and the County for these injuries. The Estate is entitled to recover the damages Mario could have recovered, including for his conscious pain, suffering, and mental anguish, to the extent not recovered under Count VII and within the limits of 51 O.S. § 154.

97. Plaintiff presented this claim as required by the GTCA, as alleged and stated above

**COUNT VII**
**Wrongful Death: Negligence (12 O.S. § 1053; GTCA) as Against Defendants OCCJA and Board of County Commissioners**

98. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

99. Under 12 O.S. § 1053, when the death of a person is caused by the wrongful act or omission of another, the decedent's personal representative may maintain an action if the decedent could have maintained one had he lived.

100. The negligent acts and omissions of OCCJA and the County, as described above, directly and proximately caused Mario's death. Had Mario lived, he could have maintained an action against Defendants OCCJA and Oklahoma County for those acts and omissions.

101. Mario is survived by his minor son, M.M., and his mother, Plaintiff Cicley Mason. Plaintiff brings this claim for their benefit as Mario's statutory beneficiaries.

102. Under 12 O.S. § 1053(B), Plaintiff seeks all damages recoverable for Mario's wrongful death, including:

a. medical and burial expenses;
b. the mental pain and anguish Mario suffered before his death;
c. the grief and loss of companionship of Mario's son and his mother;
d. pecuniary loss to Mario's survivors; and
e. all other damages recoverable under § 1053.

103. Any recovery under this Count is for the benefit of Mario's statutory beneficiaries, to be distributed as provided in 12 O.S. § 1053 and is sought within the limits of 51 O.S. § 154.

104. Plaintiff presented this claim as required by the GTCA, as alleged above.

## DAMAGES

105. As a direct and proximate result of Defendants' conduct, the Estate and Mario's beneficiaries have suffered damages, including:

a. the physical injuries and pain Mario suffered from the force used against him after his sentencing, and his conscious physical pain, fear, and mental anguish before his death;
b. medical, emergency response, funeral, and burial expenses;
c. Mario's lost earnings and earning capacity;
d. the grief and loss of companionship of Mario's son and his mother; and
e. pecuniary loss to Mario's survivors.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants, and award:

a. compensatory damages in an amount to be determined by the jury, in excess of $75,000;

b. punitive damages against John Does 1-20 in their individual capacities;

c. reasonable attorney's fees and costs under 42 U.S.C. § 1988;

d. pre-judgment and post-judgment interest as allowed by law; and

e. such other relief as the Court deems just and proper under the premises.

Respectfully submitted,

s/Ge'Andra D. Johnson
Ge'Andra D. Johnson, #32810
Johnson Legal, P.L.L.C.
11914 N. Pennsylvania Ave., Ste. B-5
Oklahoma City, OK 73120
405-648-5273: Telephone
405-673-7322: Facsimile
Email: gjohnson@johnsonlegalok.com
**ATTORNEYS FOR PLAINTIFF CICLEY MASON**